Case No. 13-5177, R.A. Bailey, Appellant v. Isaac Fulwood, Jr., Chairman of U.S. Parole Commission et al. Mr. Sullivan for the Appellant, Ms. Lyons for the Appellees. Let's wait until that courtroom clears. All right, Mr. Secretary, good morning. Good morning, Your Honors. Judge Henderson, and may it please the Court, I'd like to reserve four minutes for rebuttal. The retroactive application of a parole regulation violates the ex post facto clause of the Constitution when it creates a significant risk of increasing the duration of an inmate's incarceration. The Commission's 2010 and 2012 decisions denying Mr. Bailey parole created such a risk for three reasons. First, by their clear text, the D.C. regulations applicable when Mr. Bailey was convicted structured and limited the Commission's discretion to depart from those regulations' numerical scoring system. Second, the Commission's regulations adopted in 2000 contained no such limitation, vesting it with unfettered discretion to grant or deny parole notwithstanding the guidelines on the basis of any factor. Third, the 2010 and 2012 decisions retroactively applied the Commission's new, that were not enumerated and therefore were not permissible under the D.C. regulations applicable at the time. So can I ask you, how are you reading, this is in your addendum at page 7, Section 2004.22, The Board May in Unusual Circumstances. Yes, Your Honor. Section 22 implements the regulations' prior statement in Section 204.1, stating that the Commission, or at the time the D.C. Board, could depart from the numerical score on the basis of certain enumerated factors. But Section 22 says that in unusual circumstances, the Board, and now the Commission, may waive the SFS, that's the salient factor score, and the pre- and post-incarceration factors. Now, the SFS score and the pre- and post-incarceration factors together create the numerical recommendation to grant or deny parole. Now, what Section 22 says is that the Board, and now the Commission, can waive the numerical recommendation in unusual circumstances. And that's exactly what Section 204.1 says. And the pre- and post-incarceration factors set forth in this chapter. That's right. The pre- and post-incarceration factors are in Section 204.18, which appears on Addendum 5 and 6. Now, the way that the D.C. parole regulations at the time worked is, first there was the calculation of the salient factor score. Then there was the application of pre- and post-incarceration factors. So, Mr. Segal, I guess what I'm focusing on is, how do you read 22, but you're calling Section 22 as a limitation on discretion? Section 22 is a grant of limited discretion. And so what Section 22 says is that the Board could depart on the basis of certain factors. Now, elsewhere in the regulations it says that those factors are limited, and that's in Section 1. And so Section 22 is an implementation of the process that's summarized in Section 1. We can see this in the structure of the regulations. Section 1 says that the Board shall calculate a score, and then, and this is a quote, the any parole decision falling outside the numerically determined guideline. That is, falling outside of the SFS score plus the pre- and post-incarceration factors. And so just follow through with me on this. In other words, are you saying that necessarily the Board's 1991 policy is implementing Section 22, if I can put it that way? Yes, Your Honor. What the 1991 policy guideline did was define terms that appeared in the 1987 regulations. And so by defining those terms, and it's implementing the entire regulations, including Section 22 and the appendices 2-1 and 2-2. And so the terms that appear in the appendices 2-1 and 2-2, as enumerated permissible grounds for departing from the numerical system, are then in turn defined in the 1991 policy guideline. So if you look at your addendum at 28, subparagraph 8. Yes, Your Honor. Is that the limitation? Yes, Your Honor. And so it's a limitation in conjunction with Section 204-1 plus appendices 2 plus the 1991 guideline. Section 204-1 says that the Board may depart, but it has to do so on the basis of enumerated factors in appendices 2. Appendix 2 is for parole rehearsals. Then in appendix 2, which appears on page addendum 15, it lists three reasons that can justify departure from the numerical recommendation. Those three reasons are change in the availability of community resources, leading to a better parole prognosis, poor medical prognosis, or other change in circumstances. The 1991 guidelines then define those three terms, including other change in circumstances. And importantly, other change in circumstances is defined as occurring when the capabilities or characteristics of an offender are altered or modifies in ways that minimize the likelihood of repeated criminal involvement. That is, it's a reason why someone would be a better rather than a worse parole risk. And that helps your clients how? The reason why Mr. Bailey's challenge succeeds on the basis of this is that in 2010 and 2012, the Commission denied him parole, notwithstanding the fact that the numerical scoring system indicated that he should be granted parole. When it made that decision to depart from the numerical recommendation, it gave certain considerations for departing it. And none of those considerations were enumerated in the 1987 guideline as elaborated upon by the 1991 policy guideline. As a result, the Commission was retroactively applying the unlimited discretion that's found in the 2000 guidelines. So what you're saying is that in applying the 87 regs, you could only look at changes in circumstances that they could only exercise their discretion in a way that helped the parolee? No, Your Honor. So it may appear that way on the basis of the 1987 regulations, but the 1991 policy guideline. Well, I mean adding. I didn't add that. Adding what the 91 guidelines added. So no, Your Honor. Okay. The Commission could depart in either direction, but only on the basis of enumerated factors. And so the 1991 policy guideline defines, and this is on addendum 29, factors countervailing a recommendation to grant parole. And it lists nine factors here. Now, it's not entirely clear which of these are applicable at a parole re-hearing, but at least some of them are. And so we can be absolutely certain that factor 7, which appears on addendum 30 and 31, is applicable in parole re-hearings like Mr. Bailey's. The reason why we know that factor is applicable is because it separately says in subsection B on addendum 31  And so it defines which offenses count as repeated or extremely serious negative institutional behavior for the purposes of re-hearing. So at least some factors do apply. How do you reconcile McRae and Ellis, cases that were decided after 1991, with your view of the limited discretion that the board had? I'll address those cases in turn. So first, Ellis, this Court's case, was addressing a separate question of whether the numerical scoring system created a liberty interest under the due process clause of the Constitution. And so the question there was whether the numerical score to grant parole is a liberty interest. And the answer is no. And the reason is because there's discretion to depart from that recommendation. And all parties agree that there is such discretion. So anything beyond that holding is dicta. Now, that dicta, even if we take it as a holding, doesn't decide this case for two reasons. So the Court in Ellis said that the board in that case relied on what it took to be an unlisted factor. And so that unlisted factor that was considered was at an initial parole hearing. Now, the factors that could be considered at an initial parole hearing are listed in Appendix 2.1. And this is at addendum page 12. And one of the factors listed is other. And other remains undefined in the 1991 policy guidelines. So as an initial matter, it's clear from the opinion in Ellis that it was saying that the unlisted factor could be considered as other, where other, unlike other change in circumstances, remains undefined. Second, Ellis did not consider the 1991 policy guideline. And so the Court in Ellis didn't have the benefit of the Supreme Court's decision in Garner, which instructed that policy guidelines not like the 1991 policy guideline have to be looked at in order to determine what the parole board's actual practice was at the time. And so for those two reasons, the dicta in Ellis doesn't decide this case. Now, turning to McRae, McRae similarly addressed the question of whether the numerical scoring system created a liberty interest for the purposes of the due process clause. Now, in a footnote in that case, it also rejected the prisoner's argument that the parole board had violated Section 204.1. But the rejection of that argument, it didn't say that 204.1 doesn't apply or that the board could rely on unenumerated, unspecified factors. Rather, it held that that requirement was satisfied in that case. And indeed, the record of that case confirms that. This is in the green brief, page 24, note 7. All of the factors that were enumerated, I'm sorry, all of the factors that were considered by the board in McRae were, in fact, enumerated in the 1987 and 1991 guidelines. And so McRae simply says that the requirement of 204.1, that the board rely only on enumerated factors, does apply. And it was satisfied in that case. And so both of those cases are, in fact, consistent with the reading that I'm offering here. And that's the plain text reading, that the requirement in Section 204.1, again, that any parole release decision falling outside the numerically determined guideline must be explained by reference to the specific aggravating factors and mitigating factors that are listed. And so no case of the D.C. Court of Appeals, nor any case in this circuit, has decided the question or addressed the question of why, or of what factors the board and now commission may rely on in departing from the numerical recommendation to grant or deny parole. That question is addressed here. And the answer to that question is provided by the plain text of the statute. So now one further question is whether the government has ever provided an interpretation of these regulations that accounts for that sentence in Section 204.1 that requires that there be specific factors that the commission rely on.  Instead, the government returns to the overarching purpose of the statute. Now, there's no question that the statute that governed at the time granted a substantial amount of discretion to the board to make parole release considerations. But that discretion was cabined by the 1987 regulations. Understanding why the D.C. Parole Board decided to make that change in policy and take what was previously a broader discretion and to structure and limit it is revealed by the history behind those D.C. regulations. Prior to 1987, the governing statute provided a great deal of discretion, and the parole board's regulations mirrored the statute. But the board determined that parole release decisions were being made in an inconsistent and irrational manner. And as a result of that, it decided to impose structure and limits on its discretion. Specifically, this is discussed in this court's case, Blair Bay, and also in the district court's case in Selman in 2008. And so in Selman, the court quoted at length from the report on the development of the paroling policy guidelines for the District of Columbia Parole Board, and this is essentially the legislative history behind the 1987 regulations. And what those, as the court in Selman explained, the principles that guided the implementation of the 1987 guidelines was to provide structure, was to provide consistency, and this is important. This is a quote. The touchstone of the parole decision-making process should be based on offender characteristics that have a statistically determined bearing on the offender's risk of future involvement in criminal behavior. And so what the 1987 guidelines did, in conjunction with the 1991 policy guideline that elaborated on those initial 1987 guidelines, what they collectively did was to enumerate those factors that, in the parole board's judgment at the time, had a statistically established relationship to future criminal involvement. And so it wrote a list of what factors those were. And so now the commission now has made a different policy judgment, that there may be other considerations that could warrant a judgment that an offender is at greater risk to society. And the commission is free to make that policy judgment, as the political branches always are. However, what it can't do is retroactively change that policy determination to impose on offenders that committed their crimes in the late 80s and early 90s a more stringent parole regime that was based on the policy determination that the D.C. court made at the time. If there are no other questions. All right. We'll give you some time to reply. Thank you. Next slide. Good morning. Good morning. May it please the Court. I'd like to start by simply noting that the chair of the Parole Commission, Isaac Fullwood, has retired recently, and the new acting chair is Patricia Smoot. It is undisputed in this case that Mr. Bailey has been eligible for parole since 2010, or before then, certainly no later than. The issue is whether the Parole Commission's denial in 2010 and 2012 violated the ex post facto clause. It did not. It's clear from the record that the Parole Commission applied the 1987 D.C. Board of Parole Guidelines, which I'm just going to call the 87 Guidelines, which were in effect when he raped a Howard University student in 1993. The commission exercised its discretion based on finding Bailey a more serious risk than the point score indicated, similar to the way that had happened in Phillips. And for that reason, Phillips is a good guide for this case in terms of how to resolve it. There's a secondary issue in the case, which I will address if the Court has questions, about whether these claims should be addressed at all based on Mr. Bailey having filed a civil action in 2010, which has made its way through not one but two court systems. But as to the ex post facto claim, the test is whether the new standards create a significant risk of increasing punishment beyond the standards in place at the time of the offense. Here, there are no new standards. Amicus has posited that the commission was applying its 2000 guidelines, but the paperwork in the record, the decisions, the pre-hearing reports that go ahead and apply the salient factor score, I would note that Mr. Bailey has a salient factor score initially calculated at 8. He's never challenged that. The Parole Commission has certainly gone through the process of applying the D.C. guidelines, and there's nothing to suggest in the record that anything else is going on. So the suggestion that the 2000 Federal guidelines regulations have been applied here is simply incorrect. I think part of the argument, isn't it, that when you look at what happened when the commission was applying its own guidelines, it gave the same reasons? It gave the same reasons from what, yes. There is no doubt that there is a similarity in the reasoning of the Parole Commission under both things. On the other hand, it's examining the same question, which is whether the individual is a suitable risk to release back into the community. And how does this fit with what counsel says is the structure and text of what you're calling the 87 regulations? Yes, Your Honor. Counsel suggested during his presentation that the 87 regulations the discretion of then the D.C. parole board. And we respectfully disagree with that notion. Do you have some different legislative history, just so I'm clear about that? We don't point to anything in our brief. We simply point to the text of the 87 guidelines. And another place I would point, Your Honor, to that isn't directly on point for this, but I think is illustrative, is that the joint appendix on page 90, there's a letter that go with the 1992 policy guidelines. And the letter simply states that the D.C. Board of Parole was acting to eliminate any interpretation that the board was restricted. This is with regard to re-parole decisions. It's not directly applicable here. But to eliminate the interpretation that the board was restricted to using the specific aggravating and mitigating factors listed in the document. And what year is that? That's in 1992. That letter is 87. Okay. 92. Right. And I think that's indicative of how the court should look at the regime. The D.C. Parole Board did not view these guidelines as having its discretion. It gave it a way to regularize it, to formalize it, to structure it. But it reserved, as the statute does, it reserved for itself the opportunity to depart in appropriate circumstances. Yeah. So I went through with counsel for appellant this section 22. And what is the flaw in his analysis? I think it's either under-inclusive or over-inclusive. And I'm not going to take a position because I get them confused. But 204.1 is the broader grant of discretion for the board to deny release or grant release, grant parole, to anybody whose number doesn't match up with what they're doing, essentially, under the guidelines. 204.22 is a particular application of when that could happen. Well, Section 1, the last sentence, is certainly a limitation, isn't it? Yes, it's a limitation in terms of if the decision is outside the numerically determined range, whichever way it goes, it needs to be explained. Well, by reference to. Right. But the aggravating and mitigating factors include such things as what kinds of history of institutional conduct and other things are being used. But more importantly, 204.22 then takes that beyond 204.1 and says, in unusual circumstances, all you have to do is explain your reasons, what you considered. Well, that's if you ignore how they defined unusual circumstances. In other words, your reading, as I understand it, gives no weight to the 1991 definition. Am I wrong about that? What I would say about the 91 guidelines, Your Honor, is that the definitional changes didn't alter the structure of Appendix 2-2, which allows departure in either direction. There's no conflict in applying the definitions, and there's no restriction. The things that are enumerated are there, but there's nothing in 204.1 or anywhere else in those Section 204 procedures that says you really are only limited to those factors in every single case. So that's what's missing. That's what's missing. It's basically a prohibition. A specific sentence. I mean, they've said everything but that, in your view. I don't think so. I think, and once again, I point to the Board's, you know, the 92 letters, the most recent thing we have from the Board on its view of what it was doing with its regulations. And what specifically do you think supports your position? The, it's by analogy, of course, but it's the notion that the 92 letters I think there's nothing in that letter specifically addressing the situation here. No, I'm saying it's by analogy, but that it does reflect. And the purpose is totally consistent with Appellant's analysis of the structure and text to ensure consistency and equity. What I'm suggesting is that the language in the letter suggests that the D.C. Board was intent on reserving for itself, not being cabin to restricting, aggravating, or mitigating factors listed. Well. And by the. Extending your analysis, it doesn't say that. Okay. Okay, well. All right. But it's the 92 letter that you think is your strongest support. Well, other than the language of the procedures themselves. Well, you haven't shown me why the path that counsel has acknowledged isn't totally reflective of what the board had in mind. That's all I'm trying. I'm trying to find out how you get beyond that text and structure. Okay. Well, I would also point to, this is an appendix 2-2, which appears on addendum 15 to the opening amicus brief. It leaves itself substantial discretion by using a term as broadly defined as other change in circumstances. And I realize that's fine. And that's defined. Yes. At 28. And so you have to deal with that, don't you? You do. But the definitions are not written in a way that have the discretion as much as amicus suggests. Well, the problem is what the board has said is that if otherwise the defendant is recommended for parole, I mean, the language is funny, but it's factors countervailing a recommendation to deny parole. Yes. It has both. It has factors countervailing and then factors countervailing the other way. I would not have written it that way myself, but I wasn't there. But in either case, the factors that are then enumerated include, you know, some of them include words like ordinarily. Where are you? For example, addendum page 25. Oh, wait, that's not a great addendum. Yeah, we need to be on 27. Well, just, I mean, take the absence of or change in community resources. That's obviously a factor that can go either way. And page addendum 30, factor six, is where the incident offense involved unusual cruelty to victims. That's not defined in a way that is readily susceptible to saying yes or no. So I look at these as a guide, but we do not view these guidelines, the Parole Commission does not view these guidelines as cabining the discretion that it preserves for unusual cases where, as this court addressed in Phillips, where this total points for just doesn't reflect what the commission perceives to be the right level of risk for the person. As to Ellis and McRae, I think the important point about Ellis is that it looks to McRae. It specifically says we're looking to McRae, and McRae is the D.C. Court of Appeals in 1995 assessing this system as not a rigid formula or a constraint on the parole board's discretion. And another point about McRae is that the offender there, who admittedly had a much more extensive criminal history than Mr. Bailey, but the comparison point is that he had made little or no effort toward rehabilitation. And that is one of the main reasons that the Parole Commission has relied upon to deny Mr. Bailey parole to this point, is that he has not achieved any programming. They call it programming. I hate that word. He hasn't had any sex offender education to help him reduce the risk to society upon his release. And so I think McRae, as looked to in Ellis, is, in addition to Phillips, instructive about why this case does not present, as Fletcher required, a creditable claim of an ex post facto violation. If there are no further questions, I ask that the decision be affirmed. I do have one question on 204.22. And it says the board may waive not only the SFS, but also the pre- and post-incarceration factors, which sounds like, if you didn't have anything else, that the sky's the limit. They could pick out a – because they can waive those factors that are enumerated and come up with something that should. That's right. It's that sort of grant of discretion. It is a very broad system of discretion, admittedly. That's absolutely true. You're reading it exactly correctly. That's what the plain language says. And then they defined what they meant. Yeah. Defined without limitation, defined somewhat. But that's not how the courts have looked at it. That's not how the D.C. Board of Parole looked at it when it still existed. And therefore, there isn't an ex post facto violation here. And how do you know that? And you're relying on this 92 letter? I'm relying on part of the 92 letter. I'm relying on McCrae, where the D.C. Court of Appeals described the 1987 guidelines as a scoring system, but not a rigid formula or a constraint on the parole board's discretion. So I'm relying on that authority, which this court looked to in Ellis, as important. And I think it is important because that reflects the view of the District of Columbia court on that issue. You started out by saying that the commission here had actually applied the 1987 guidelines. And I guess our discussion about how they are applying it, or about the meaning of the 1987 guidelines and the 1991 policy, is to say what they did was consistent with the 1987 guidelines. Counsel, of course, is arguing that the way they applied it isn't consistent, so they must have been applying something else. But if that's the case, since the commission says that's what they're applying, is this an ex post facto challenge, or is it just at most saying they misapplied the guidelines? I agree that it's pure speculation based on the record, and I think there's an ordinary presumption applied that government officials who are doing their jobs and saying they're doing them are doing them the way they say they're doing them. This speculation is no basis here. So I agree that, and I tried to say this at some point in my presentation, that I didn't think this meant the creditable claim standard from Fletcher that even gets you over the hurdle of the searching analysis. I'm maybe not getting these terms exactly right. Well, that's the Gambrell case. That's next. I'll defer to my colleagues. We're here in Bailey, yeah. Thank you, Your Honor. No further questions. I ask that judgment be confirmed. All right. Thank you. Does Mr. Seligman have any time? Why don't you take two minutes? Thank you, Your Honors. I'd like to make two points in rebuttal. First, the government has still not offered an interpretation of the crucial sentence in Section 204.1 that explicitly states that the commission's discretion is limited to relying on specifically enumerated factors to depart from a numerical recommendation to grant parole. Instead, the government suggests that that categorical imperative, it uses the word shall, can be disregarded in certain circumstances. But there's no textual indication that that's the case. Instead, the government relies on the 1992 letter, and the government is correct that that letter says that the board was explaining that it didn't want a cabinet's discretion. But what the government omits is that the 1992 regulations relating to parole set-offs, which is the time in between parole hearings, explicitly state that the grounds on which the board could rely included but were not limited to the enumerated grounds. And so that textual difference between the 1987 and 1991 parole guidelines that are relevant to the suitability for parole, it differs from the text of the regulations that apply to a set-off. And so the 1992 letter rather confirms that the commission's or the board's discretion was limited. Second, I'd like to address the pre- and post-incarceration factors that Judge Henderson was curious about. You must not read waive to mean ignore. Right. And so the parole guidelines are not the clearest in the world, but the text does demonstrate that the pre- and post-incarceration factors that are referenced in Section 22, it refers to the pre- and post-incarceration factors that are previously accounted for in Section 18. And that is on page addendum 5 and 6. Now, this is all clear, I think, in the appendices, and specifically Appendix 2.1. So what happens is the selling factor score is calculated, and that creates a risk category of low, medium, high, and very high. And so once that risk category is decided, there's a point score, and that point score can be adjusted by pre- and post-incarceration factors pursuant to Section 18. And this appears in Appendix 2.1 on addendum 9 and 10. And so the selling factor score generates an initial point. Then that point score is adjusted by the pre- and post-incarceration factors pursuant to Section 18. And then that combined score is called the total point score. The total point score then generates a yes or no answer, a recommendation to grant or deny parole. And it is from that, the selling factor score plus the pre- and post-incarceration factors, that determination is what the board can depart from on the basis of specifically enumerated factors in Appendices 2.1 and 2.2. And so the pre- and post-incarceration factors that can be waived are part of the numerical score, and that's crucial to understanding the extent of the commission's discretion. Would you read that sentence to say waive the SFS and the pre- and post-incarceration factors that were used to arrive at it? That's right. And so I think this is particularly clear on addendum 11, which implements the regulations. On addendum 11, there's a table that says at the top, selling factor score category. It's low, fair, moderate, high. There's points associated with that. Those points can be adjusted by going up for certain types of risk, that is, pre-incarceration factors. Then post-incarceration factors are in the next two rows, and that generates what's called a total point score. That's in the middle of the page. And then the total point score is translated into a recommendation to grant or deny parole. Now, below that, at the bottom of the page, there's a worksheet that says, number five, decision is within, below, or above the guidelines. And then there's a heading that says, reason if outside the guidelines. And so the guidelines were the numerical calculation that happened before. Then the reasons that are listed below that are reasons to depart from the numerically determined guideline recommendation, and that's exactly what the regulations say in Section 22. And so it's clear from the regulations that the discretion to depart from the numerically generated recommendation to grant or deny parole is limited to those enumerated factors, which are different from the pre- and post-incarceration factors. And I'd also like to answer Judge Brown's question about whether this is an ex post facto question at all. And so I take it that your question is whether the Commission simply misapplied the regulations or whether it was retroactively applying. And so the Commission was retroactively applying what it took to be unlimited discretion under the 2000 guidelines. And so this is clear for at least two reasons. First, the administrative record in Mr. Bailey's history confirms that the analysis stayed the same from 2004 and 2007 when the Commission was explicitly applying the 2000 regulations, and 2010 and 2012 when it was purporting to apply the 1987 regulations. Now, the person remained the same, which the government has stressed. But the analysis should have changed because under the district court's order in the Selman case, it directed the Commission to begin applying the 1987 regulations. But the analysis would only change if, in fact, the Commission thought that they were restricted by the structure of the 1987 guidelines and the 1991 policy as you have described it. But they could have thought that the other category, and the unusual circumstances category, gave them broad discretion. So they could have thought – I mean, there's no reason for us to assume that they lied. They said we applied the 1987 factors, which suggests that they may have gotten it wrong. The way you've described it, perhaps they did. But if they got it wrong, that's not an ex post facto problem. That's a misapplication problem. So there's no question that the – we need not establish that there was any bad faith on the part of the Commission, and no one is suggesting that they lied or consciously lied when they were saying that they applied the 1987 regulations. But what's clear from the administrative record is that the Commission applied a different and more stringent parole regime. Now, whether that's characterized, as the briefs here where I attempt to characterize it, as a retroactive application of the 2000 guidelines or, as the plaintiffs in Gamble have suggested, that it's a new and unwritten parole – set of parole guidelines, that actually doesn't matter. What matters is that there's something new and that it's harsher. It doesn't matter whether it's the 2000 guidelines or something else. All that matters is that it's new and it's harsher. And I know I'm over my time, but I'd like to address this Court's decision in Phillips, which is in some respects most on point to this case. All right. Did Ms. Lyons mention it, if she did? She did, yes, Your Honor. And so this Court in Phillips rejected the ex post facto claim of Mr. Phillips, whose parole sentence prior to the 1987 guidelines. And the Court did not reach or address the issue here. And to see why, the Court in Phillips held that the plaintiff incorrectly characterized the Commission's decision in that case. What he said the Commission decided was that it relied on offense accountability to depart from the numerical recommendation. And this Court held that that's not, in fact, what the Commission relied on. Instead, it made the determination that Mr. Phillips was a more serious risk than his point score indicated. And the Court went on, Mr. Phillips had not given any reason in his briefs to think that the Board wouldn't have come to the same conclusion. Now, what the Court didn't address in Phillips is what factors the Commission could rely on in making the determination that Mr. Phillips was a more serious risk. And Mr. Phillips didn't press that argument, and the Court didn't address it. And when you look at the record of that case, it's clear that the Commission, in fact, relied on enumerated factors. The facts of that case are that the Commission relied on. Mr. Phillips went to his ex-girlfriend's apartment, forced her to lure her new boyfriend to his apartment, and stabbed that new boyfriend to death. And after that, he stabbed the ex-girlfriend. After he was released, after being arrested for those two crimes, he went back to the same apartment and confronted her new companion and stabbed him to death after an altercation. And that new companion was an off-duty police officer. These are the factors that the Commission considered in denying Mr. Phillips parole. And each of these factors could be considered under the 1987's enumerated list. On Green Addendum 29, the second factor, ongoing criminal behavior or community adjustment as evidenced by failure to remain free of criminal activity over sustained periods of time. He was arrested after two violent felonies and committed another one after that. Factor three, also on Green Addendum 29, a history of repetitive, sophisticated criminal behavior for serious crimes involving premeditation or methodical planning or assault of criminal behavior. And both of those are satisfied in the Phillips case because he premeditated going over to his ex-girlfriend's apartment. Finally, on Green Addendum 30, unusual cruelty to victims, which includes, among other things, physical, mental, or emotional abuse beyond the degree necessary to sustain the conviction. And forcing his ex-girlfriend to lure her new boyfriend to his death certainly counts as emotionally abusive. And so the result of all of this is that the Phillips Court confronted a situation in which the Commission, in fact, relies solely upon enumerated factors under the 1987 and 1991 guidelines. And so it didn't reach the issue in this case, but even if it had reached the issue in this case, the requirements of the regulations to rely on specifically enumerated factors were satisfied. All right. Mr. Seligman, you were appointed by the Court to represent Mr. Bailey, and you've done an outstanding job. The Court thanks you. Thank you, Judge Anderson.
judges: Henderson, Rogers, Brown